ISHEE, J,
 

 for the Court.
 

 ¶ 1. The Chancery Court of Chickasaw County consolidated the two cases that arose following the death of Margie Allen DeMoville (Margie Allen): one, case number 2007-CA-00189-COA, concerned the validity of the will of Margie Allen; the other, case number 2007-CA-00141-COA concerned the alleged misappropriation of the assets of Margie Allen and of the DeMoville partnership.
 
 [1]
 
 The partnership included Margie Allen and her two daughters — Margaret DeMoville (Margaret) and Dixie DeMoville Johnson (Dixie). Following a trial in the chancery court, an impaneled jury found that Margie Allen’s will was invalid and that Margaret was liable to the estate and to the partnership. Thereafter, the chancellor entered a judgment finding Margie Allen’s will to be
 
 *369
 
 invalid and ordering Margaret to pay the estate $58,000. The chancellor also found that Margaret was liable to the partnership for $84,448. In a final judgment entered on January 16, 2007, the chancellor denied Margaret’s motion to alter or amend the judgment and ordered her to pay $25,000 in punitive damages and $204,872.72 in attorney’s fees and costs.
 

 ¶2. Margaret presently appeals from that judgment and asserts three points of error:
 

 I. The chancellor erred in awarding punitive damages.
 

 II. The chancellor erred in refusing to reimburse her for necessary expenses in caring for her non compos mentis mother.
 

 III. The evidence was insufficient to support the jury’s finding that Margie Allen’s will was invalid because of her lack of testamentary capacity.
 

 Margaret does not appeal the chancellor’s distribution of the partnership assets or the ruling that she received improper gifts from Margie Allen. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. Following the death of Dixie and Margaret’s father, John Q. DeMoville, in 1984, his estate passed to his wife, Margie Allen, and his two children. Margie Allen received fifty percent of his estate, and Dixie and Margaret each received twenty-five percent. A significant portion of the estate consisted of 4,000 acres of farmland, which Margie Allen and her daughters began renting to farmers. Desiring to keep the estate intact, the parties formed a partnership and permitted Margie Allen to operate it. Dixie and Margaret executed a power of attorney granting Margie Allen the authority to manage the estate in their names. Margie Allen died on January 30, 2005, and she was survived by Margaret and Dixie. In her will, Margie Allen left everything in her considerable estate to Margaret.
 

 ¶ 4. Believing that Margaret had exerted undue influence over Margie Allen in the execution of the will, Dixie filed suit to have it declared invalid. Dixie also filed a separate suit alleging misappropriation of partnership assets by Margaret. Dixie claimed that Margaret’s influence over their mother led to disproportionate distributions between the sisters.
 

 ¶ 5. Under Margie Allen’s administration of the partnership, Dixie and Margaret received distributions of partnership income. Such distributions were made at Margie Allen’s discretion. Dixie admitted that Margie Allen’s distributions to the sisters were initially equal. However, she took issue with discrepancies in gifts that Margie Allen later gave them, feeling that Margie Allen gave a disproportionate amount to Margaret.
 

 ¶ 6. Dixie testified that she began to notice problems with her mother’s mental health sometime around 1992 or early 1993. Dixie noticed that Margie Allen would repeatedly ask questions that had already been answered and would become snappy and unreasonable. In contrast to what Dixie described as her mother’s usual steel-trap mind, Margie Allen forgot to pay her life insurance premiums in 1995, which resulted in the insurance company cancel-ling her coverage until Margaret convinced them to reinstate it.
 

 ¶ 7. As Margie Allen’s mental health deteriorated, it became increasingly unpleasant for Dixie to travel with her mother. According to Dixie, Margie Allen would become agitated and unreasonable on trips that Margie Allen would take with her daughters. Dixie described three trips in
 
 *370
 
 particular — Italy, Hawaii, and a cruise. On the cruise, Margie Allen did not realize where she was, and she even asked a stranger whether he knew where Shannon or Verona, Mississippi were located. Following the cruise in 1998, Margie Allen was hospitalized.
 

 ¶ 8. Earlier in April 1998, Margie Allen’s physician had referred her to a specialist in geriatric medicine. Dr. Ken Davis examined Margie Allen and noted that she suffered from short-term memory loss and that she was not aware of the date or month. Based on his examination and testing, Dr. Davis diagnosed Margie Allen with mild dementia of the Alzheimer’s type. He characterized dementia as a loss of memory or a loss of cognitive function. It was November 1998 when Margie Allen was admitted to the hospital where she became, as Dr. Davis described, very disoriented or confused. She was then admitted to the Behavioral Health Center, a psychiatric hospital in Tupelo, Mississippi. In addition to Margie Allen’s dementia, Dr. Davis said that she was experiencing delirium, which he described as confusion and paranoid ideations-a release from reality in which things that are not real seem real. Last, Dr. Davis testified that he did not think Margie Allen was cognitively able to drive safely or to live alone.
 

 ¶ 9. Upon her admission to the Behavioral Health Center, Margie Allen was examined by Dr. Morris Alexander. According to the tests administered to Margie Allen upon her admission to the Behavioral Health Center, she was cognitively impaired, with one test indicating that she was severely deficient. Dr. Alexander concluded that she had a significant decline in her ability to think.
 

 ¶ 10. Susan Shue, a psychiatric counsel- or at the Behavioral Health Center, testified that she met with Margie Allen, Margaret, and Dixie when Margie Allen was admitted. Shue said that the daughters had told her about Margie Allen’s problems paying her bills, letting her insurance lapse, and getting lost. Shue described Margie Allen as disoriented, defensive, in denial about having difficulties, and confused about where she was. When Margie Allen was discharged, Shue said that Margie Allen should no longer drive and that she needed to be kept under twenty-four-hour supervision.
 

 ¶ 11. Dr. Jan Goff, who was admitted to testify as an expert in psychiatry, treated Margie Allen during her stajr at the Behavioral Health Center. He continued to treat her from the time she was admitted in 1998 until August 2004, on an average of every three to six months. His testimony reinforced the prior testimony given by Dr. Alexander. According to Dr. Goff, at the time of Margie Allen’s admission, a patient in her condition would have begun to lose the ability to initiate and engage in matters of judgment and self-care. Dr. Goffs notes from Margie Allen’s visit in August 1999 indicate that he thought she was capable of managing usual household tasks and making judgments concerning simple everyday affairs. However, Dr. Goff felt that Margie Allen required supervision while operating any dangerous machinery such as a stove, and he found that her ability to make any complex decisions was poor. Dr. Goffs notes indicate that only a month later, Margie Allen’s dementia progressed to the point of getting lost, misidentifying family members, and failing to differentiate what was real from what was not.
 

 ¶ 12. By October 2000, Dr. Goff found that Margie Allen’s dementia had progressed to the point that she was asking about dead people as if they were alive. His opinion was that Margie Allen could be deceived very easily. Around the time that the contested will was executed, Dr.
 
 *371
 
 Goff believed that Margie Allen understood very little and would be very susceptible to influence.
 

 ¶ 13. Additionally, Dixie offered the testimony of other witnesses who corroborated Margie Allen’s diminished mental ability. Reverend Jennifer Johnson — the minister at Margie Allen’s church-testified that Margie Allen once drove off with her car door open, and she once had to pick up Margie Allen from the police department because she had been driving around with her door open. Dixie’s son, Robert Quinn Johnson (Quinn), recounted how Margie Allen once yelled at his girlfriend believing that she had stolen Margie Allen’s car. Quinn also recounted how Margie Allen would tell him that he looked just like her grandson Quinn, and sometimes she would confuse Margaret and Dixie.
 

 ¶ 14. Margaret downplayed the extent of Margie Allen’s mental condition and claimed that her mother had final say on everything until the day she died. Margaret denied that she ever took over the operations of the family farm from Margie Allen, but she did admit that she became more involved in managing the farm as her mother’s condition worsened. From 1998 through 2000, Margaret admitted that she received gifts from Margie Allen totaling more than $200,000. The gifts included thousands of dollars in birthday presents as well as payments to cover Margaret’s personal income and land taxes. She admitted that during that time period, she received significantly more gifts from her mother than Dixie received. However, she claimed that both she and Dixie had received more money than they were entitled to receive, and she argued that the money ultimately belonged to their mother who could distribute it as she pleased. Margaret also refused to provide Dixie with the partnership records.
 

 ¶ 15. At one meeting with Dixie, which Margaret secretly tape-recorded, Margaret told her mother that Dixie was trying to take her money. At another secretly taped meeting, Margaret told Margie Allen that Dixie was going behind Margie Allen’s back to look at Margie Allen’s records-the partnership records. Margaret also told her mother that Dixie was trying to sue her. After Dixie left one of the taped meetings, Margie Allen was recorded telling Margaret that she thought Dixie was dangerous and that she might kill someone. Margie Allen said that she thought Dixie might kill her or Margaret, and Margaret’s statements reinforced that sentiment in her mother.
 

 ¶ 16. Honorable Kenneth Burns, the attorney who prepared Margie Allen’s will, testified regarding the execution of her will.
 
 [2]
 
 He testified that he spoke with Margie Allen at least two times before she signed the will on October 9, 2000, and it was just Margie Allen and him in his office when she instructed him as to how to draft her will. After initially meeting with her, he recommended that she go see a doctor because he did not think that she understood what she was doing. Dr. Don Smith, a general practitioner in Okolona, Mississippi, examined Margie Allen and wrote a letter to Burns indicating that Margie Allen was “suffering from short-term memory loss but is lucid at times.” The letter contained no other mention of Margie Allen’s mental condition or her ability to execute a will. Thereafter, finding Margie Allen to be lucid, Burns prepared a will as instructed by Margie Allen. It was Burns’s opinion that Margie Allen had a
 
 *372
 
 problem with Dixie’s husband, and that was the reason she left everything to Margaret.
 

 ¶ 17. Burns admitted that Margaret was always the one who brought her mother to his office regarding the will. He also said that Margaret either called him or visited his office at least five times in the month prior to the will’s execution. It was Burns’s recollection that Margaret, not Margie Allen, was the first person to contact him about drafting the will. When Dixie’s attorney questioned Burns on cross-examination as to whether he was aware that Margie Allen had been diagnosed with Alzheimer’s and that she had been seeing a psychiatrist for the problem, he stated that he was unaware of her mental condition. He said he would not have drafted the will if he had known about her mental condition. Burns was also unaware of a letter that Dixie’s attorney had sent to Margaret requesting to see estate records. Again, Burns said he would not have drafted the will if he would have had knowledge about a dispute between the sisters.
 

 ¶ 18. Burns’s secretary, Abby May, testified that as far as she knew, Margie Allen was lucid. However, she said that Margaret was always with her mother for the two years preceding the will’s execution, and she said that Margaret would be the one to call or bring her mother to the office. May was also unaware of Margie Allen’s mental condition and was unaware of the exact number of times that Margaret or Margie Allen called or visited the office. Furthermore, she did not remember some details about the execution of the will.
 

 ¶ 19. Dr. Smith, the physician to whom Margaret took Margie Allen after Burns expressed concern about her competency, testified that he was never asked to perform a competency exam on Margie Allen. He was unaware that Margie Allen had been seeing a psychiatrist and that she had been hospitalized for dementia. Dr. Smith’s records indicated that he recognized Margie Allen’s short-term memory loss and her possible Alzheimer’s type dementia, but he did not treat her for those problems. He only treated her for general checkups and small medical problems that would arise.
 

 ¶20. Following the execution of the will, Margaret moved Margie Allen from Okolona to Margaret’s home in Tupelo. Thereafter, Dixie had no contact with her mother until she obtained a court order requiring Margaret to allow her to visit Margie Allen. It was Margaret’s testimony that Margie Allen never saw Dixie during this period of time because Margie Allen did not want to see her.
 

 ¶ 21. Following Margaret’s adverse testimony, Dixie requested that the chancellor consider whether punitive damages were appropriate, and then she rested her case.
 

 ¶ 22. Besides Burns and his secretary, Margaret called a number of other witnesses who testified as to Margie Allen’s competency and her relationship with her daughters. Beth McAuley, who also lived in Tupelo, testified that she was involved in a number of organizations with Margaret and Margie Allen. McAuley said that the two of them were very close and that they did everything together.
 

 ¶ 23. Nancy Clark, who lived in Okolo-na and knew the parties from church, described the relationship between Margaret and Margie Allen as “beautiful.” She said that she did not notice much difference between Margie Allen’s mind after she moved in with Margaret in Tupelo. She thought of Margie Allen as a very strong-willed woman.
 

 
 *373
 
 ¶ 24. Steve Holland, of Lee County, testified that he had known the DeMovilles for decades. He said Margie Allen was a strong-willed woman and that she was completely lucid the last time he saw her, which was about six months prior to her death. In the fifteen or twenty years before Margie Allen’s death, Holland said that he usually saw Margaret with her. He was not as well acquainted with Dixie because she lived farther away.
 

 ¶ 25. Pam Armstrong, Bessie Lewis, Janice Walker, Nancy Whitten, and Nick Chandler testified similarly about Margie Allen and her relationship with Margaret. Lewis additionally told the court that Margie Allen had once told her that Dixie had threatened her. Sidney Whitlock, who had been on the board of directors of the Bank of Okolona, testified that he had advised Margie Allen that when she opened a certificate of deposit, she should open the C.D. in two parties’ names so as to avoid potential legal problems. It turned out that Margie Allen ultimately placed her name and Margaret’s name on the C.D. John Herrod, Jr., president and chief operating officer of the Bank of Okolona, testified that the bank had no record for Margie Allen’s account from 1984 through 1992, and from 1993 to 1997, the records were not indexed so as to be located.
 

 ¶ 26. The chancellor noted that the only part of the jury’s verdict that he was required to follow was the ruling concerning the validity of Margie Allen’s will. The jury returned a verdict finding: (1) Margie Allen’s will was invalid; (2) Margaret misappropriated $84,448 in partnership funds; and (3) Margaret accepted improper gifts from Margie Allen in the amount of $58,000. In the final judgment, the chancellor found Margie Allen’s will to be invalid. The judgment also adopted the jury’s findings and ordered Margaret to pay the estate $58,000 and to pay the partnership $84,448. Lastly, the chancellor ordered Margaret to pay $25,000 in punitive damages and to pay Dixie’s attorney’s fees of $204,872.72.
 

 DISCUSSION
 

 I. Whether the evidence was sufficient to support a finding that Margie Allen’s will was invalid due to her lack of testamentary capacity.
 

 ¶ 27. First, we address Margaret’s claim regarding the validity of her mother’s will. Margaret argues that there was no evidence that Margie Allen lacked testamentary capacity to execute a will; therefore, the issue should not have been presented to the jury. Margaret argues that it was in error to deny her motions for a directed verdict and for a new trial.
 

 A. Testamentary Capacity
 

 ¶ 28. This Court will reverse the denial of a motion for a directed verdict “only where the evidence of an element of the claim is so lacking that reasonable jurors could find only for the non-movant.”
 
 In re Estate of Pigg; McClendon v. McClendon, 877
 
 So.2d 406, 409(¶ 10) (Miss.Ct.App.2003) (citing
 
 Harrison v. McMillan,
 
 828 So.2d 756, 764(¶ 24) (Miss.2002)). Furthermore, the grant or denial of a motion for a new trial is within the chancellor’s sound discretion.
 
 In re Will of Smith; Smith v. Averill,
 
 722 So.2d 606, 613(¶ 28) (Miss.1998) (quoting
 
 Andrew Jackson Life Ins. Co. v. Williams,
 
 566 So.2d 1172, 1177 (Miss.1990)).
 

 ¶ 29. In determining whether Margie Allen possessed testamentary capacity, the jury considered three factors: (1) whether she had the ability “to understand and appreciate the effects of her act,” (2) whether she had the ability “to understand the natural objects or persons
 
 *374
 
 to receive her bounty and their relation to her,” and (3) whether she was capable of determining “what disposition she desired to make of her property.”
 
 Id.,
 
 722 So.2d at 610(¶ 12) (citing
 
 In re Will of Wasson,
 
 562 So.2d 74, 77 (Miss.1990)). The relevant time period for considering these factors was the time the will was made.
 
 Id.
 

 ¶ 30. Besides Drs. Davis and Goff, Margaret’s argument on appeal outright dismisses all of Dixie’s witnesses’ testimonies as irrelevant because they did not observe Margie Allen at a time closer in proximity to the drafting of the will. Margaret places great emphasis on the testimonies of the two subscribing witnesses, Burns and May. However, Burns testified that he initially had concerns about Margie Allen’s competency, and he refused to draft a will for her until she was examined by a doctor. He eventually did draft Margie Allen’s will, but only after she and Margaret returned with the letter from Dr. Smith. Burns went on to testify that he was unaware of Margie Allen’s mental condition or that she had been seeing a psychiatrist. He said he would not have drafted the will for Margie Allen if he had known about her mental condition.
 

 ¶ 31. When questioned about his examination of Margie Allen and about the letter to Burns, Dr. Smith testified that he did not examine Margie Allen for competency. He merely performed her general checkups. He said that he was unaware of Margie Allen’s mental condition or that she had been hospitalized for dementia.
 

 ¶ 32. We find that Dixie presented sufficient evidence on which a jury could determine that Margie Allen lacked testamentary capacity to create a will; therefore, the issue was properly presented to the jury. We also find that the chancellor did not abuse his discretion in refusing to grant Margaret’s motion for a new trial.
 

 B. Undue Influence
 

 ¶ 33. Regarding undue influence: “A presumption of undue influence arises in a will contest when a beneficiary occupies a confidential relationship with the testator and there is active participation by the beneficiary in either procuring the will or in preparing the will.”
 
 Averill,
 
 722 So.2d at 611—12(¶ 18) (citing
 
 In re Will of Adams,
 
 529 So.2d 611, 615 (Miss.1988)).
 

 ¶34. In the present case, there was ample testimony indicating that Margaret was in a confidential relationship with Margie Allen. Margaret was taking care of Margie Allen and was managing her affairs under a power of attorney that Margie Allen had executed in favor of Margaret. Margaret also took over more of the management of the partnership as Margie Allen’s mental condition worsened. Under these circumstances, Margaret drove Margie Allen to see Burns to draft a new will, and Margaret took her to the doctor to prove to Burns that Margie Allen was competent. There was also testimony that Margaret called Burns concerning the creation of the will. In the will that Margaret participated in preparing, Margie Allen left all of her assets to Margaret.
 

 ¶ 35. We find these facts to be sufficient to survive a directed verdict on the issue of undue influence. We also find that the chancellor was within his discretion in infusing to grant Margaret’s motion for a new trial on this issue. Therefore, this issue is without merit.
 

 II. Whether the chancellor erred in awarding punitive damages.
 

 ¶ 36. Margaret next argues that the chancellor erred in awarding punitive damages to Dixie. She makes two arguments concerning the allegedly improper punitive damages. First, Margaret argues that Dixie failed to prove that Margaret committed fraud or acted with actual malice.
 
 *375
 
 Second, Margaret claims that the chancellor erred by failing to hold an evidentiary hearing on the issue of punitive damages.
 

 ¶ 37. The question of whether or not to award punitive damages is an issue for the fact-finder based upon the circumstances of the case.
 
 Aqua-Culture Techs. v. Holly,
 
 677 So.2d 171, 184 (Miss.1996) (citing
 
 Harvey-Latham Real Estate v. Underwriters at Lloyd’s, London,
 
 574 So.2d 13, 16 (Miss.1990)). “The awarding of punitive damages, when allowable, is discretionary with the jury or with the judge trying cases without a jury.”
 
 Id.
 
 (quoting
 
 Ellis v. S. Pellegrini, Inc.,
 
 163 Miss. 385, 391, 141 So. 273, 274 (1932)). The decision to award punitive damages is within the discretion of the chancellor, and upon review, this Court will not overturn that decision absent an abuse of discretion.
 
 Id.
 
 at 185 (citing
 
 Fought v. Morris,
 
 543 So.2d 167, 173 (Miss.1989)).
 

 ¶ 38. Margaret relies on Mississippi Code Annotated section ll-l-65(l)(a) (Supp.2008) to support her argument that Dixie failed to make a case for punitive damages. Section ll-l-65(l)(a) provides the following: “Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.” Margaret dismisses the possibility that Dixie proved actual fraud or gross negligence and instead argues that Dixie failed to prove actual malice.
 

 ¶ 39. Dixie does not contest that she failed to show actual fraud or gross negligence. However, she responds that the chancellor properly found Margaret’s breach of her fiduciary duty to be so “shocking and indefensible” as to warrant punitive damages.
 

 ¶ 40. This Court addressed a somewhat similar issue regarding punitive damages in
 
 Smith v. Orman,
 
 822 So.2d 975, 978(¶ 9) (Miss.Ct.App.2002). In
 
 Oman,
 
 the appellants took issue with the chancellor’s award of damages based on their alleged misappropriation of estate assets and with the chancellor’s failure to conduct an evi-dentiary hearing regarding punitive damages.
 
 Id.
 
 Based in part on the chancellor’s findings that the appellants in
 
 Oman
 
 had concealed estate assets, this Court found no error with the chancellor’s award of $20,000 in punitive damages.
 
 Id.
 
 at 980 (¶¶ 20-22).
 

 ¶ 41. There was no concealment of assets in the present case, but the chancellor found that Margaret intentionally misappropriated assets from her mother’s estate. In an order filed on December 29, 2006, the chancellor found the following regarding punitive damages:
 

 The Court finds that during the seven (7) day trial the evidence firmly established that Margaret misappropriated partnership funds and received improper gifts from her mother. The evidence firmly established that the misappropriation of partnership funds and [Margie Allen’s] personal assets were willfully and wrongfully taken and in reckless disregard for the rights of Dixie.
 

 Margaret’s defense that the funds received represented gifts from her mother was contradicted by circumstances and was improbable and incomplete. The fiduciary relationship that Margaret shared with her mother and the partnership was clearly established from 1998 on up to the death of [Margie Allen] given the take-over by Margaret of her mother’s personal business as well as the partnership business. The total dependence of [Margie Allen] on Margaret because of [Margie Allen’s] declining
 
 *376
 
 health further reinforces the fiduciary relationship.
 

 Margaret owed a special duty to Dixie and her mother to properly manage the partnership assets. She was required to exercise good faith, and she failed to do so.
 

 Margaret allowed [Margie Allen] to waste partnership assets at a time when she knew her mother was suffering from dementia, which included impaired judgment and memory.
 

 The acts of Margaret in receiving improper gifts and misappropriating partnership funds was no accident. It was consciously and deliberately done on her part, and she profited from, these acts.
 

 Similarly, the jury returned a verdict finding that Margaret had misappropriated her mother’s assets. The record before us supports the findings of the jury and the chancellor. Ultimately, the decision to award punitive damages was within the discretion of the chancellor, as fact-finder, and we see no error with that decision.
 

 ¶ 42. In support of her claim that the chancellor committed a procedural error in failing to hold an evidentiary hearing on the issue of punitive damages, Margaret cites to Mississippi Code Annotated section 11—1—65(l)(c) (Supp.2008). In any case in which punitive damages are sought, section 11—1—65(l)(c) requires a trial court, following an award of compensatory damages, to “promptly commence an evidentia-ry hearing to determine whether punitive damages may be considered by the same trier of fact.” If the court determines that the issue of punitive damages may be considered, the trier of fact “shall determine whether to award punitive damages and in what amount.” Miss.Code Ann. § 11—1— 65(l)(d) (Supp.2008).
 

 ¶ 43. In her reply brief, Margaret somewhat abandons one of her arguments and admits that the chancellor did actually hold an evidentiary hearing on the issue of punitive damages. However, she takes issue with the fact that there was no evidence in the record from the hearing because no court reporter was present.
 

 ¶44. In
 
 Oman,
 
 this Court found that the need for an evidentiary hearing on punitive damages is lessened when a case is tried in chancery court because the chancellor serves as the trier of fact.
 
 Orman,
 
 822 So.2d at 980(¶ 18). After reviewing the record in
 
 Oman,
 
 this Court found no error with the chancellor’s decision not to hold a separate hearing on punitive damages.
 
 Id.
 
 As was the case in
 
 Orman,
 
 the chancellor in the present case was the trier of fact for all of the issues besides the will contest.
 

 ¶ 45. The role of the jury in a will contest is not merely advisory; the jury occupies the same role “as that of a jury in a civil trial in a court of law.”
 
 Fowler v. Fisher,
 
 353 So.2d 497, 501 (Miss.1977). Mississippi Code Annotated section 91-7-29 (Rev.2004) provides that witnesses in a will contest “shall be examined orally before the jury....” The chancellor recognized that he was bound by the jury’s determination of whether the will was properly executed. However, the chancellor noted that for the other issues, the jury’s findings were merely advisory. During a discussion on jury instructions, the chancellor stated, “You understand that this is a jury trial, but in a jury trial such as this then the verdict of the jury is advisory to the court, and I can accept it or reject it. It’s not insofar as the will is concerned.”
 

 ¶ 46. Ultimately, barring a statutory exception, the right to a jury in chancery court is within the chancellor’s discretion, and if a jury is impaneled, its findings are merely advisory.
 
 Era Franchise Sys., Inc. v. Mathis,
 
 931 So.2d 1278, 1288(¶ 30)
 
 *377
 
 (Miss.2006) (citing
 
 Union Nat’l Life Ins. Co. v. Crosby,
 
 870 So.2d 1175, 1181-82(¶ 21) (Miss.2004)). The chancellor had the authority to award punitive damages, and the chancellor, as the fact-finder, heard all the relevant testimony. We find no error with the award — procedural or substantive. Therefore, this issue is without merit.
 

 III. Whether the chancellor erred in refusing to award Margaret compensation for expenses in caring for her mother.
 

 ¶ 47. In Margaret’s final allegation of error, she takes issue with the chancellor’s refusal to reimburse her for the expenses she claimed to have incurred in caring for Margie Allen.
 

 ¶ 48. At the close of the conservator-ship, Margaret did not make any claim for reimbursement of expenses. She was notified of the pending closure of the conserva-torship and was allowed to present any objections regarding such. She was also present and represented by counsel at the final hearing to close the conservatorship. Nevertheless, Margaret made no claims until after the jury returned a verdict adverse to her. At that time, she attempted to probate claims against the estate of Margie Allen in the amounts of $56,420 and $249,792. She claimed that these amounts were for services rendered and out-of-pocket expenses. Margaret later filed additional claims for probate against the Margie Allen’s estate. Margaret claimed $83,721.28 for out-of-pocket expenses, $225,792 for care of Margie Allen, and $234,400 for room and board.
 

 ¶ 49. Finding that Margaret made no request for compensation prior to or at the time of the closure of the conservatorship, the chancellor refused to grant any amount to Margaret for the care she provided for Margie Allen prior to the closure of the conservatorship on December 20, 2005. The chancellor supported the ruling by the finding that Margaret, as she testified throughout the trial, provided care for her mother solely out of love and did not expect compensation. The chancellor also noted that Margaret provided care for her mother in the interest of her her well-being. These findings are supported by the record. The chancellor later entered a judgment awarding Margaret $14,684.41 for funeral expenses, which were incurred following the closure of the conservator-ship.
 

 ¶ 50. The chancellor based his ruling on
 
 In re Estate of Thomas; Saunders v. Thomas,
 
 853 So.2d 134, 136 (¶¶ 10-11) (Miss.Ct.App.2003). In
 
 Thomas,
 
 this Court noted that under Mississippi Code Annotated section 93-13-259 (Rev.1994), the same laws applicable to the guardianship of a minor were also applicable to a conservatorship.
 
 Id.
 
 at (¶ 11). In applying Mississippi Code Annotated section 93-13-77 (Rev.1994) in
 
 Thomas,
 
 this Court concluded that a conservator must file a request for compensation for services at the time of the final accounting of the conservatorship.
 
 Id.
 
 Any appropriate compensation must then be included in the decree closing the conservatorship.
 
 Id.
 
 In
 
 Thomas,
 
 the conservator who sought compensation filed her claim months after the conservatorship was closed; therefore, this Court found that her claim came too late and that she could not recover the amount that she claimed to have expended as conservator.
 
 Id.
 

 ¶ 51. Margaret attempts to argue that notwithstanding the fact that she failed to file a claim at the closure of the conservatorship, she should be reimbursed for expenses because Margie Allen was non compos mentis and could not make a contract. Margaret relies on
 
 Talbert v. Ellzey,
 
 203 Miss. 612, 620, 35 So.2d 628, 631-32 (1948) to support her position. In
 
 *378
 

 Talbert,
 
 the supreme court stated that “an insane person or estate is legally obliged to pay for necessities furnished such person in good faith under circumstances justifying their being furnished.”
 
 Id.
 
 at 617-18, 35 So.2d at 630.
 

 ¶ 52. We must first note the irony contained in this argument as it contradicts Margaret’s position at trial and on appeal — that her mother was a competent person who was capable of making a will. Regardless of Margie Allen’s mental condition, the proper method for a conservator to seek reimbursement to recover the expenses of caring for her charge is provided for by statute.
 
 See Thomas,
 
 853 So.2d at 136 (¶¶ 10-11). Margaret was fully aware of the pending closure of the conservator-ship, and she even attended the final hearing. Nevertheless, she waited until after the jury returned a verdict that was adverse to her to seek any compensation. We see no reason why the chancellor would not have awarded Margaret proper expenses if she had properly complied with the requirements. The chancellor readily reimbursed her for Margie Allen’s funeral expenses that were incurred after the closure of the conservatorship.
 

 ¶ 53. Margaret has not denied that she failed to seek reimbursement prior to the closure of the conservatorship; neither has she provided a reason why she failed to file such a claim for reimbursement. Accordingly, we find no error with the chancellor’s determination that her claims for expenses were untimely and, therefore, barred. This issue is without merit.
 

 ¶ 54. THE JUDGMENT OF THE CHANCERY COURT OF CHICKASAW COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 . The will contest arose in Chickasaw County, and the case alleging misappropriation of assets arose in Lee County. In the interest of judicial economy and to avoid a multiplicity of suits, the parties jointly stipulated that both matters should be tried in the Chancery Court of Chickasaw County. The Chancery Court of Lee County entered an order transferring the case, which was then consolidated with the pending will dispute.
 

 [2]
 

 . At the lime of trial, Kenneth Burns was a chancery court judge, bul at the time he prepared Margie Allen's will, he was nol a judge.